# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TIMOTHY HEARN**, <br> 400 Symphony Circle, Unit 525 <br> Cockeysville, Maryland 21030 <br><br> **Plaintiff,** <br><br> v. <br><br> **JONES LANG LASALLE AMERICAS, INC** <br> 200 East Randolph Drive <br> Chicago, IL  60601 <br> Serve On:  Corporation Service Company <br>                1090 Vermont Avenue, NW <br>                Washington, D.C.  20005 <br><br> **Defendant.** | Civil Action No. |

## NOTICE OF REMOVAL

### EXHIBIT A

Superior Court Complaint

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TIMOTHY HEARN,<br>400 Symphony Circle, Unit 525<br>Cockeysville, Maryland 21030,<br><br>      Plaintiff,<br><br>v.<br><br>JONES LANG LASALLE AMERICAS, INC.<br>200 East Randolph Drive<br>Chicago, Illinois 60601<br>Serve On:  Corporation Service Company<br>                1090 Vermont Avenue, NW<br>                Washington, D.C. 20005<br><br>      Defendant. | Case No.: |

## COMPLAINT

### PRELIMINARY STATEMENT

Plaintiff Timothy Hearn sues Defendant Jones Lang Lasalle Americas, Inc. ("JLL") and alleges:

1.     Timothy Hearn is 59 years old and for more than 35 years has worked in virtually every sector of the commercial real estate industry, including some of the world's largest real estate firms and businesses that he helped build from the ground up. During his career, Mr. Hearn has earned a well-deserved reputation for professionalism and integrity that is widely recognized and respected by his colleagues in the industry.

2.     In January 2016, recognizing his talent and experience, Defendant hired Mr. Hearn to lead its property management business in the Mid-Atlantic Region. The beginning of Mr. Hearn's employment with Defendant coincided with Defendant's acquisition of two companies that Mr. Hearn founded, in which he held a controlling stake, and for which he served

as President and CEO.  The companies, CIB, LLC and CIB Management, LLC (the "CIB Companies"), provided commercial real estate brokerage services and property management services in the Baltimore area and were a competitor to Defendant.

3. In connection with Defendant's acquisition of the CIB Companies, Defendant and Mr. Hearn agreed that he would serve as Senior Vice President of Defendant's property management business in the Mid-Atlantic region for five (5) years.  Mr. Hearn and Defendant executed an Employment Agreement in late 2015, but, after Mr. Hearn began to work at Defendant, it became apparent that the promises it had made to Mr. Hearn were false, and that it never had any intention of honoring them.

4. While he was employed at Defendant, Mr. Hearn discovered the company's illegal and unethical practice of encouraging and assisting its employees to avoid the continuing education requirements that are conditions of their licensure under D.C. Mun. Regs. Tit. 17 § 2605, and similar requirements under the laws of the State of Maryland, Md. Code Ann., Bus. Occ. & Prof. § 17-315, and the Commonwealth of Virginia, Va. Code Ann. § 54.1-2105.03.

5. Mr. Hearn's employment with Defendant ended abruptly on June 22, 2018, which (not coincidentally) was the same day that he was scheduled to meet with Defendant's human resources department to express his concerns about Defendant's practice of encouraging and enabling its employees to fraudulently certify that they had complied with the District of Columbia's continuing education requirements.

6. After Mr. Hearn's employment was terminated, his job responsibilities were quickly assigned to two individuals who were substantially younger and less experienced than he was.

## JURISDICTION

7.  This Court has jurisdiction over this matter pursuant to D.C. Code § 11-921.

## PARTIES

8.  Plaintiff Timothy Hearn is 59 years old and a resident of Maryland.

9.  Defendant Jones Lang Lasalle Americas, Inc. is a corporation headquartered in the State of Illinois. Its principal office is located at 200 East Randolph Drive, Chicago, Illinois 60601 though it maintains offices throughout the United States, including one at 2020 K Street NW, Washington, D.C. 20006, where Mr. Hearn was employed. Defendant is a subsidiary of Jones Lang Lasalle Incorporated, which is also located at 200 East Randolph Drive, Chicago, Illinois 60601.

## STATEMENT OF FACTS

10. Mr. Hearn began his employment with Defendant in January 2016, which coincided with Defendant's acquisition of the CIB Companies. Mr. Hearn had helped build the CIB Companies from the ground up and he served as President and CEO until their acquisition by Defendant. He also owned a controlling stake of their equity.

11. While both CIB Companies were flourishing, CIB Management's success was particularly noteworthy. Before it was acquired, CIB Management was the largest third-party property management company in the Baltimore region. It employed 60 people and had more than 14 million square feet in more than 200 buildings under management.

12. During negotiations over Defendant's purchase of the CIB Companies, Defendant repeatedly represented its view that its property management business in Baltimore was unprofitable and lacked leadership. As Defendant's market position in Baltimore was languishing, CIBM was flourishing. Defendant marveled at CIBM's ability to run a profitable

business year after year and deliver a high quality of service to its clients with low employee turnover and a high degree of employee satisfaction. While most property management businesses in the Baltimore area are unprofitable, in 2015 CIBM, LLC generated approximately $7.7 million in annual revenue and was on track at the time Defendant entered into the purchase agreements for the company to achieve an 11% EBIDTA.

13. To induce Mr. Hearn to agree to Defendant's purchase of the CIB Companies, Defendant entered into an Employment Agreement (the "Agreement") with Mr. Hearn. Without Mr. Hearn's consent to the purchase, Defendant would not have been able to gain control of the CIB Companies, which was advantageous to Defendant because it eliminated one of its competitors and raised its profile in the Baltimore market.

14. Under the Agreement, Mr. Hearn was to serve "as an External Title Senior Managing Director, Property Management (Mid-Atlantic) and Internal Title Regional Manager, Property Management and National Director" for five years. In that capacity, he would have "primary responsibility for property management in the Mid-Atlantic Region." The Mid-Atlantic Region covers Maryland, Washington, D.C., and Virginia and, as of January 2016, included nearly 300 properties (totaling more than 40 million square feet). Defendant's Mid-Atlantic property management group employs approximately 300 people.

15. The express terms of the Agreement confirmed the representations that Defendant made to Mr. Hearn in the course of the negotiations over its purchase of the CIB Companies. For example, in April 2015, Mr. Hearn met with Michael Ellis and Mark Levy who introduced him to the idea of leading Defendant's property management business in the Mid-Atlantic region. In the summer of 2015, when Defendant flew Mr. Hearn to Chicago to meet with members of the national leadership team for its property management business, they emphasized

that Mr. Hearn would be leading the property management group in the Mid-Atlantic Region. In fact, Defendant had no intention of allowing Mr. Hearn to do so.

16. After he began his employment with Defendant, however, Mr. Hearn's supervisors told him that a younger, less experienced employee would oversee significant elements of the portfolio. It was only after Mr. Hearn complained that he had not agreed to such an arrangement, and substantial back-and-forth about the role of the other employee, that Defendant allowed Mr. Hearn to assume responsibility for some (but not all) of the leadership responsibilities that it had attempted to give to the junior employee.

17. Despite those difficulties, Mr. Hearn's impact was quickly noticeable. By the end of 2016, the Mid-Atlantic property management group was first among Defendant's 15 property management regions in gross revenue. In 2017, the Mid-Atlantic property management group increased its total revenue over the prior year, and it was again first in the nation in gross revenue.

18. In addition to leading the Mid-Atlantic property management group to financial success, Mr. Hearn helped it grow in other ways as well. For example, in 2017, Mr. Hearn helped the Mid-Atlantic property management group create a leadership development program, for which it received the prestigious REME Award for Employee and Leadership Development from the Institute of Real Estate Management. *See* JLL Mid-Atlantic wins 2017 REME Award! http://dcblog.jll.com/jll-mid-atlantic-wins-2017-reme-award/. In 2018, one of Mr. Hearn's employees received Defendant's highest honor, the Champions of Excellence Award, based on Mr. Hearn's nomination. It was the first time an employee from the Mid-Atlantic property management group had ever received the award.

19. Notwithstanding Mr. Hearn's success, Defendant continued to limit his responsibilities. In in the summer of 2017, Defendant removed Mr. Hearn's responsibility for overseeing industrial properties even though the Mid-Atlantic property management group out-performed all other of Defendant's other regions in industrial property management in 2016 and 2017.

20. In the first quarter of 2017, Mr. Hearn also discovered Defendant's practice of helping is employees avoid the continuing education requirements that are a condition of their state-issued professional licenses. D.C. Mun. Regs. Tit. 17 § 2605, requires real estate brokers, property managers, and salespersons to complete fifteen (15) hours of continuing education coursework every two years. *See id.* at § 2605.3. The State of Maryland and the Commonwealth of Virginia have similar requirements.

21. After a continuing education seminar that Defendant hosted in Bethesda, Maryland in early 2017, some of the employees in the property management group commented on how the instructor had covered the material in just a faction of the time that it should have taken. Others noted that several participants (Defendant's employees) entered the room just to sign the attendance sheet and then left. Shortly after the seminar, Mr. Hearn asked Mark Levy who led the Mid-Atlantic region's industrial group and Defendant's Baltimore brokerage office, why Defendant was helping its employees end-run the licensing requirements. Mr. Levy responded that many of Defendant's employees believed the continuing education requirements were a waste of time and the region's real estate boards rarely, if ever, audited commercial companies to make sure their employees had completed the requirements.

22. Disturbed by Defendant's contempt for the District of Columbia's continuing education requirements (as well as those of its neighboring jurisdictions), Mr. Hearn instructed

his leadership team (approximately 20 people in all) that they, and the people they supervised, should not participate in Defendant's scam licensing classes and that they should go online to fulfill their continuing education requirements properly. Mr. Hearn also encouraged his employees to look at the websites for the licensing agencies in the District of Columbia, Virginia, and Maryland so they could see how many people received suspensions for trying to shortcut their continuing education requirements.

23. In the fall of 2017 at an executive strategic planning meeting for the Mid-Atlantic Region, held in Arlington, Virginia, Mr. Hearn again voiced his concern about the practice to Mr. Levy. Mr. Levy responded that Mr. Hearn needed to "get with the program" and "understand how big companies operated." Afterwards, Mr. Hearn approached Clayton Krum, Senior Director of Human Resources, to raise his concerns. Mr. Krum was sympathetic, but said that human resources was not involved in professional licensing and that Mr. Hearn should work things out with the broker leads, like Mr. Levy.

24. In early 2018, Defendant scheduled another continuing education session at its offices in Washington, D.C. In advance of the session, Mr. Hearn reminded his leadership team that they, and their property managers, should not participate in the sham course. Adam Skrodzki, one of Defendant's human resources representatives, was in attendance when Mr. Hearn issued that reminder.

25. A few weeks later, Mr. Hearn met with Chris Molivadas, Defendant's Market Director for the Mid-Atlantic Region. During their conversation, Mr. Molivadas mentioned that Mr. Levy had complained to him about Mr. Hearn's comments regarding Defendant's licensing practices. Mr. Hearn voiced his concerns about the issue to Mr. Molivadas and told Mr. Molivadas that he had set up a meeting with Mr. Skrodzki to review the situation.

7

26. Mr. Hearn's meeting with Mr. Skrodzki was set for June 22 and Mr. Hearn told Mr. Skrodzki beforehand that he wanted to discuss his concerns about Defendant's practice of fraudulently certifying that its employees had fulfilled their continuing education requirements when, in fact, they had not. The meeting never occurred, however, because Mr. Hearn's supervisors, Mr. Molivadas, and Mr. Crum, canceled the meeting and scheduled another one for 10 a.m. that day, where Mr. Hearn was terminated.

27. At the time of his termination, Mr. Hearn was 58 years old and was exceeding all of Defendant's legitimate expectations for performance. Indeed, in the spring of 2017 and the spring of 2018, Defendant paid Mr. Hearn performance-based bonuses that demonstrated that he was exceeding Defendant's expectations for his performance.

28. After his termination, Defendant assigned what remained of Mr. Hearn's responsibilities to two individuals, both of whom were substantially younger and less experienced than Mr. Hearn. On information and belief, one of the individuals who replaced Mr. Hearn was in her mid-30's and the other was in her early 40's.

29. On April 17, 2019, Mr. Hearn filed a charge of discrimination with the United States Equal Employment Opportunity Commission. Ex. 1. Mr. Hearn received a right-to-sue letter from the EEOC on July 15, 2019. Ex. 2.

**CAUSES OF ACTION**

**COUNT I**
**(Fraudulent Inducement)**

30. Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

31. Before Mr. Hearn began his employment at Defendant in January 2016, Defendant represented to him that he was being hired to lead Defendant's property management business in the Mid-Atlantic region for a term of five years. Mr. Hearn's Employment

Agreement specifically provided that he would have "primary responsibility for property management in the Mid-Atlantic Region" and that he would "serve as an External Title Senior Managing Director, Property Management (Mid-Atlantic) and Internal Title Regional Manager, Property Management and National Director." Defendant offered Mr. Hearn his position as an inducement to get him to agree to Defendant's purchase of the CIB Companies.

32. In fact, Defendant's representations were knowingly false, and it had no intention of allowing Mr. Hearn to lead its property management business in the Mid-Atlantic Region. Defendant's intention was merely to facilitate its acquisition of the CIB Companies, which gave Defendant the advantage of eliminating a competitor in the market.

33. Defendant revealed its true intentions when it began taking away Mr. Hearn's responsibilities after he started his employment at Defendant and again when it fired him halfway through the five-year term of employment contemplated by the Agreement.

34. Mr. Hearn reasonably relied on Defendant's false representation that he would lead its property management business in the Mid-Atlantic Region, which was made with the intent to deceive him into signing the Agreement as part of Defendant's acquisition of the CIB Companies, which he did.

35. As a direct, proximate, and consequential result of Defendant's fraudulent representations, Mr. Hearn has suffered damages in excess of $1 million. In addition, Mr. Hearn seeks punitive damages for Defendant's intentional, grossly fraudulent, and outrageous misrepresentations.

## COUNT II
## (Wrongful Discharge)

36. Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

37. In the District of Columbia, property managers are required to fulfill continuing education requirements every two years. *See* D.C. Mun. Regs. Tit. 17 § 2605.3.

38. While employed by Defendant, Mr. Hearn discovered Defendant's practice of encouraging and assisting its employees, including its property managers, to certify that they had completed the necessary continuing education requirements when, in fact, they had not.

39. Mr. Hearn instructed his leadership team that they and people they supervised who held state-issued professional licenses, were not to engage in the practice of fraudulently certifying that they had completed their continuing education requirements, as Defendant would otherwise have them do.

40. After voicing his concerns to several of his superiors, including Mark Levy, Clayton Krum, and Chris Molivadas, Mr. Hearn scheduled a meeting for June 22, 2018, with Defendant's human resources department to report the issue, but Mr. Hearn's supervisors canceled that meeting and scheduled another one for 10 a.m. on June 22, 2018, at which Mr. Hearn was terminated.

41. Mr. Hearn's termination for attempting to report Defendant's illegal conduct of falsely certifying that its employees had completed their continuing education requirements was wrongful and in violation of the public policy of the District of Columbia.

42. At the time of Mr. Hearn's discharge, he was exceeding all of Defendant's legitimate expectations for his performance.

43. As a direct, proximate, and consequential result of Mr. Hearn's wrongful discharge, Mr. Hearn has suffered damages in excess of $1 million.

## COUNT III
### (Age Discrimination in Violation of D.C. Code § 2-1402.11)

44. Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

45. D.C. Code § 2-1402.11(a) prohibits an employer from discharging any individual or discriminating against any individual with respect to the terms, conditions, or privileges of employment, "wholly or partially for a discriminatory reason based on the actual or perceived . . . age . . ." of that individual.

46. Defendant was Mr. Hearn's employer from January 2016 until June 22, 2018.

47. At the time Mr. Hearn began his employment with Defendant, he was 55 years old and had 30 years of experience working in commercial real estate. Over the course of Mr. Hearn's employment with Defendant, Defendant removed his responsibility for leading property management in the Mid-Atlantic region and assigned it to significantly younger, less experienced, employees. When Mr. Hearn was ultimately terminated on June 22, 2018, his responsibilities were assigned to significantly younger, less experienced, employees.

48. Defendant took away Mr. Hearn's responsibility for leading property management in the Mid-Atlantic region and it terminated him wholly, or in part, because of his age.

49. At the time of Mr. Hearn's discharge, he was exceeding all of Defendant's legitimate expectations for his performance.

50. As a direct, proximate, and consequential result of Defendant's discrimination against Mr. Hearn, including his ultimate termination, Mr. Hearn has suffered damages in excess of $1 million.

## COUNT IV
### (Age Discrimination in Violation of 29 U.S.C. § 623)

51. Plaintiff incorporates each of the foregoing allegations as if fully restated herein.

52. The Age Discrimination in Employment Act, 29 U.S.C. § 621 – 634, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623.

53. Defendant was Mr. Hearn's employer from January 2016 until June 22, 2018.

54. When Mr. Hearn began his employment with Defendant, he was 55 years old and had more than 30 years of experience working in commercial real estate. Over the course of Mr. Hearn's employment with Defendant, Defendant removed his responsibilities for leading property management in the Mid-Atlantic region and assigned it to significantly younger, less experienced, employees.

55. After Mr. Hearn was ultimately terminated on June 22, 2018, his responsibilities were assigned to significantly younger, less experienced, employees.

56. Defendant took away Mr. Hearn's responsibility for leading property management in the Mid-Atlantic region and it terminated him because of his age.

57. At the time of Mr. Hearn's discharge, he was exceeding all of Defendant's legitimate expectations for his performance.

58. As a direct, proximate, and consequential result of Defendant's discrimination against Mr. Hearn, including his termination, Mr. Hearn has suffered damages in excess of $1 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Award Plaintiff damages in an amount greater than $1 million, to be proved at trial;

B.  Award Plaintiff punitive damages for Defendant's intentional, grossly fraudulent, and outrageous misrepresentations, which induced him to sign his employment agreement with Defendant.

C.  Grant any such other and further relief as this Court may deem just and proper.

Respectfully submitted,

*/s/ Andrew D. Levy*
Andrew D. Levy (D.C. Bar No. 458998)
Kevin D. Docherty (*pro hac vice* to be submitted)
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T:  410.962.1030
F:  410.385.0869
adl@browngold.com
kdocherty@browngold.com

Dated:  October 1, 2019           *Attorneys for Plaintiff*

# EXHIBIT 1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

District of Columbia Office of Human Rights and EEOC
*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Timothy Hearn | (410) 458-3494 | ▬/1960 |

| Street Address | City, State and ZIP Code |
|---|---|
| 400 Symphony Circle, Unit 525, Cockeysville, Maryland 21030 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Jones Lang Lasalle | 20+ | (202) 719-5787 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2020 K Street NW, Suite 1100, Washington, D.C. 20006 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: Fall 2017    Latest: June 22, 2018
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

1. I was hired by JLL in January 2016 to be Senior Vice President and lead Mid-Atlantic Property Management, which included office and industrial properties, plus certain retail properties.

2. I worked out of JLL's Washington, D.C. office, 2020 K Street NW, Suite 1100, Washington, D.C. 20006. JLL's headquarters are located at 200 East Randolph Drive, Chicago, Illinois 60601.

3. In the fall of 2017, my responsibility for managing the industrial portfolio was taken away because of my age. I was 57 years old at the time; I was replaced in that role by an individual who was approximately 33 years old at the time.

4. On June 22, 2018, I was terminated "without cause." I was 58 years old at the time.

5. JLL replaced me because of my age with an individual who was substantially younger than I was at the time.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

Date: 4/16/2019
Charging Party Signature: [signed]

NOTARY – When necessary for State and Local Agency Requirements

[signed] Denise M Altobelli

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT
[signed]

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)
4/16/2019

DENISE M. ALTOBELLI
NOTARY PUBLIC - STATE OF MARYLAND
ANNE ARUNDEL COUNTY
My Commission Expires March 11, 2022

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br>☐ FEPA<br>☒ EEOC | Agency(ies) Charge No(s): |
|---|---|---|
| District of Columbia Office of Human Rights | | and EEOC |
| State or local Agency, if any | | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet)

6. Individuals with knowledge of these facts include, J. Clayton Krum, Amy Lacock, and Megan Matthews, all of whom work in JLL's Washington, D.C. office. In addition, Michael Corso has knowledge of these facts. Mr. Corso is currently employed by Cushman & Wakefield, in its Baltimore office.

---

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

4/16/2019

Date — Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

4/16/2019

DENISE M. ALTOBELLI
NOTARY PUBLIC-STATE OF MARYLAND
ANNE ARUNDEL COUNTY
My Commission Expires March 11, 2022

# EXHIBIT 2

EEOC Form 161 (11/16)     **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Timothy Hearn<br>400 Symphony Circle<br>Cockeysville, MD 21030 | From: | Washington Field Office<br>131 M Street, N.E.<br>Suite 4NW02F<br>Washington, DC 20507 |
|---|---|---|---|

[ ]    *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 531-2019-02001 | Alan W. Anderson,<br>Deputy Director | (202) 419-0756 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

- NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

/s/ Alan W. Anderson (for)

Mindy E. Weinstein,
Acting Director

JUL 11 2019
*(Date Mailed)*

Enclosures(s)

cc:
Julie Baker
Employment Litigaiton Counsel
JONES LANG LASALLE
200 E Randolph Street
Suite 4800
Chicago, IL 60601

Kevin D. Docherty, Esq.
BROWN GOLDSTEIN LEVY
120 E. Baltimore Street, Suite #1700
Baltimore, MD 21202

Enclosure with EEOC
Form 161 (11/16)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – not 12/1/10 – in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*